IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 19, 2003

## STATE OF TENNESSEE v. RICKY ALLEN DAVIS

**Direct Appeal from the Circuit Court for Franklin County**
**No. 13950     J. Curtis Smith, Judge**

---

**No. M2002-02264-CCA-R3-CD - Filed April 14, 2004**

---

The appellant, Ricky Allen Davis, was convicted by a Franklin County Jury of one count of assault, a Class A misdemeanor; two counts of vandalism under $500, Class A misdemeanors; and one count of disorderly conduct, a Class C misdemeanor. Following a sentencing hearing, the trial court sentenced the appellant on each of the Class A misdemeanors to eleven months and twenty-nine days confinement and on the Class C misdemeanor to thirty days confinement to be served in the county jail at seventy-five percent. On appeal, the appellant contends that the trial court erred by allowing the victim's mother to testify at the sentencing hearing regarding the victim's nightmares resulting from the assault. Upon review of the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

David O. McGovern, Assistant Public Defender, Jasper, Tennessee, for the appellant, Ricky Allen Davis.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steven M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The appellant's convictions stem from an altercation with his girlfriend in the early morning hours of March 24, 2001. Around 10:00 p.m. on March 23, after purchasing various alcoholic beverages, the appellant, the victim, Larry and Amy Ingle, and Sam Lappin went to the Ingles' house

to play cards and drink. After drinking and playing cards for approximately two hours, the appellant and the victim began arguing. Thereafter, the group decided to leave.

The victim drove the appellant and the others to the home of the appellant's mother where the Ingles had left their vehicle. During the drive, the appellant and the victim continued to argue, and the appellant struck the victim "open handed across the face."[1] According to the victim, the appellant struck her two more times in the face, and her nose was "really hurting" and bleeding. Upon their arrival at the appellant's mother's house, the Ingles and Lappin got out of the victim's vehicle. According to the victim,

> [The appellant] got out and opened up a beer and poured an entire beer out in the passenger seat and then slung the bottle at me and it hit me in the head and busted. . . .
>
> . . . .
>
> [The appellant then] slammed the door and started walking towards the house, and . . . about that time I saw him grab another bottle, . . . and he threw it and it hit my car.

The victim drove home, where she lived with her parents. The victim's mother took her to the emergency room, and her father and brother cleaned the beer and blood from the vehicle. An examination revealed that the victim's nose was fractured, requiring outpatient surgery.

In the early morning hours of March 24, 2001, Winchester Police Officer Kevin Smith responded to an assault call at the Southern Tennessee Medical Center's emergency room. Upon arrival, Officer Smith observed that the victim's face was swollen and "very bruised," and her nose was "obviously . . . distorted." After questioning the victim, Officer Smith notified Officer Lamar Howard to look for a black Z-71 Chevrolet truck, which belonged to Lappin. Officer Howard subsequently stopped the truck and called Officer Smith to the scene of the traffic stop. When Officer Smith arrived at the scene, he observed the appellant sitting in the passenger seat of the truck. Officer Howard was arresting Lappin for driving under the influence. As Officer Smith approached the appellant, the appellant exclaimed, "I didn't hit that f***ing bitch . . . ."

Officer Smith ultimately arrested the appellant for assault, handcuffing the appellant and placing him in the backseat of the patrol car. At trial, Officer Smith testified that upon being placed in the patrol car, the appellant became "very violent and belligerent and he started . . . [hitting] his head on the screen . . . that's in between the passenger driver area of the patrol car or . . . kicking it, I couldn't tell . . . ." The appellant "knock[ed] out" the left rear window of the patrol car.

---

[1] At trial, the appellant claimed that the victim struck him prior to his striking the victim.

The Franklin County Grand Jury subsequently returned an indictment charging the appellant with one count of aggravated assault, two counts of vandalism, and one count of disorderly conduct. On March 18, 2002, a jury convicted the appellant of one count of the lesser offense of assault, two counts of vandalism, and one count of disorderly conduct. A sentencing hearing was scheduled for April 29, 2002. However, the appellant failed to appear for the sentencing hearing, and the trial court issued a capias for his arrest. The appellant was arrested pursuant to the capias on July 4, 2002. The sentencing hearing was rescheduled for July 25, 2002.

At the sentencing hearing, Beth Rhoton, the "captain jail administrator" of the Franklin County Sheriff's Department, testified that the appellant had been ordered to report to jail on July 21, 2000, to begin serving a sentence on an unrelated assault conviction. However, the appellant failed to report. Rhoton subsequently filed charges against the appellant for failure to appear.

Carol Medley, an employee of the Franklin County Circuit Court Clerk's Office, testified that on April 29, 2002, the appellant failed to appear for sentencing in the instant case. Thereafter, the Franklin County Grand Jury returned an indictment charging the appellant with felony failure to appear. On cross-examination, Medley acknowledged that on April 29, 2002, the courthouse "received a bomb scare," resulting in the evacuation of the courthouse. She conceded that the appellant had been present prior to the evacuation, but he did not return when the courthouse reopened. Medley related that of the six defendants scheduled for sentencing that day, the appellant was the only one who did not return to court.

Kim Young, the victim's mother, testified that since the offenses the victim had left home to attend college. Young related that following the assault, the victim sought counseling and experienced nightmares. Young explained, "I was spending the night with [the victim] at school . . . this past May and I experienced the nightmares that she had been telling me about. I slept[] in the bed with her and she awakened me tossing and slapping across the covers and . . . it went on all night." Over defense counsel's objection, Young was allowed to testify that upon awaking from the nightmare, the victim told her "it was another nightmare where [the appellant] was chasing her."

The appellant testified at sentencing that on April 29, 2002, he appeared for sentencing, but was required to evacuate the courthouse. He maintained that he waited outside the courthouse for an hour before leaving for a doctor's appointment. The appellant called the courthouse "a couple of hours later" and was informed that a capias had been issued for his arrest.

The appellant acknowledged that he "was wrong and . . . very sorry for everything that's happened." However, he asserted that the victim had struck him prior to his striking the victim. The appellant further related that since the assault, he had not had any contact with the victim. The appellant testified that he married a week prior to sentencing, and his wife's parents offered him employment doing "general farmwork" on their horse farm.

On cross-examination, the appellant conceded that after learning that a capias had been issued for his arrest, he did not "turn himself in" and was not arrested until July 4, 2002. The appellant

further admitted that he had an extensive misdemeanor record. Moreover, on the date of the instant offenses, the appellant was serving a suspended sentence for an unrelated assault conviction.

The appellant's wife and her mother testified on behalf of the appellant at sentencing. They confirmed that a job opportunity awaited the appellant at the horse farm. The appellant's wife claimed that after the capias was issued for the appellant's arrest, she suggested that he "turn himself in."

Following the testimony and the arguments of counsel, the trial court sentenced the appellant to an effective sentence of eleven months and twenty-nine days confinement to be served at seventy-five percent.[2] The appellant now brings this appeal.

## II. Analysis

On appeal, the appellant contends that the trial court erred by allowing the victim's mother to testify at the sentencing hearing regarding the victim's nightmares resulting from the assault. Specifically, the appellant asserts that the testimony was inadmissible hearsay and the victim's mother was not qualified as an expert "dream interpreter." The appellant further asserts that, assuming the testimony did fall under the excited utterance exception to the hearsay rule, it was irrelevant and prejudicial. The State maintains that the trial court properly admitted the testimony as an excited utterance.

At trial, hearsay statements are generally inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802. However, at sentencing, reliable hearsay is admissible as long as the opposing party had a fair opportunity to rebut it. Tenn. Code Ann. § 40-35-209(b) (Supp. 2002). Moreover, "it is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996).

One exception to the hearsay rule is the "excited utterance," which is defined as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). In order for a statement to qualify as an excited utterance, (1) there must be a startling event or condition; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant is under the stress or excitement from the event or condition. State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997). The rationale for admitting "excited utterances" is two-fold:

> "First, since this exception applies to statements where it is likely there was a lack of reflection--and potential fabrication--by a

---

[2] The jury imposed a $2,500 fine for the assault conviction, a $950 fine for the conviction for the vandalism of the victim's truck, a $1,000 fine for the conviction for the vandalism of the patrol car, and a $50 fine for the disorderly conduct conviction.

declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity . . . . Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it."

Gordon, 952 S.W.2d at 819-20 (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 803(2).1, at 532 (3d ed. 1995)).

As previously noted, at sentencing, the victim's mother was allowed to testify that since the assault, the victim had suffered from nightmares.[3] The victim's mother related that upon awaking from one such nightmare, the victim told her that she had dreamed that the appellant was chasing her. The trial court allowed the testimony under the excited utterance exception to the hearsay rule, finding,

> The startling event or condition was awak[ing] in the middle of the night thrashing about. . . . I find that the statement that she made was under the stress of that situation and it came to be a nightmare about an event . . . some time later as the proof is shown here and I find the statement relates to that event or condition.

We agree that the victim's mother could testify that the victim was suffering from nightmares. However, we are unable to conclude that the victim's statement to her mother upon awakening from a nightmare meets the requirements of an excited utterance under Rule 803(2) of the Tennessee Rules of Evidence. We also are unable to conclude that the hearsay testimony was sufficiently reliable to be admissible at sentencing. See Tenn. Code Ann. § 40-35-209(b). Regardless, even if the testimony were admitted in error, we conclude that the error was harmless. Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). In her statement contained in the presentence report, the victim related that "[s]he still has nightmares as a result of the offense . . . ." Moreover, in sentencing the appellant, the trial court noted,

> The[re] were objections made to the victim's mother testifying as to what the [victim] said and what she saw in those situations where she spent the night with [the victim]. I allowed that in but certainly that

---

[3] The victim did not testify at the sentencing hearing. According to the victim's statements contained in the presentence report, the victim was "afraid to return home from college to visit her family while [the appellant was] free" and "she did not want her current location revealed in [the presentence] report because she was afraid that the [appellant] would come after her."

is not a determining factor. There's ample other proof in the record to support the sentence . . . .[4]

Thus, it appears that the trial court afforded the victim's nightmare little, if any, weight. This issue is without merit.

### III. Conclusion

Based upon the foregoing, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE

---

[4] The trial court ordered the appellant to serve seventy-five percent of his sentence in confinement based upon the appellant's previous history of criminal convictions and criminal behavior and his previous history of unwillingness to comply with the conditions of a sentence involving release into the community.